IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

LAWRENCE DALE COOK,

        Plaintiff,

        v.                                   Civil Action No. 2:10-cv-87

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.


## REPORT AND RECOMMENDATION CLAIMANT'S MOTION FOR SUMMARY JUDGMENT BE DENIED

### I. Introduction

A.    <u>Background</u>

Plaintiff, Lawrence Dale Cook, (hereinafter "Claimant"), filed his Complaint on July 12, 2010, seeking Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant, Commissioner of Social Security, (Commissioner).[1] Commissioner filed his Answer on October 1, 2010.[2] Claimant filed his Motion for Summary Judgment on November 1, 2010.[3] Commissioner filed his Motion and Memorandum in Support of Summary Judgment on November 30, 2010.[4]

B.    <u>The Pleadings</u>

    1.    Plaintiff's Motion for Judgment on the Pleadings.

---

[1] Dkt. No. 1.

[2] Dkt. No. 6.

[3] Dkt. No. 9.

[4] Dkt. Nos. 11 & 12, respectively.

2. Defendant's Motion for Summary Judgment.

C. <u>Recommendation</u>

For the following reasons, I recommend that:

1. Claimant's Motion for Summary Judgment be **<u>DENIED</u>** because the ALJ properly evaluated the treating physician's reports, correctly assessed Claimant's credibility, and was in compliance with SSR 96-7p.

2. Commissioner's Motion for Summary Judgment be **<u>GRANTED</u>** for the same reasons.

## II. Facts

A. <u>Procedural History</u>

Claimant filed an application for Supplemental Security Income ("SSI") on September 10, 2007, alleging back problems and hypertension as work limiting conditions with an onset date of June 1, 1996. (Tr. 11, 49, 110). The application was initially denied on January 17, 2008, and on reconsideration on March 14, 2008. (Tr. 49, 56). Claimant requested a hearing before an Administrative Law Judge (hereinafter "ALJ") on April 22, 2008, and received a hearing on July 15, 2009, in Wheeling, West Virginia. (Tr. 27, 59). During the hearing, Claimant amended his alleged onset date to September 10, 2007. (Tr. 40).

On September 4, 2009, the ALJ issued a decision adverse to Claimant finding that the severity of his impairments did not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1525, 404.1526, 416.925 and 416.926). (Tr. 11-20). Claimant requested review by the Appeals Council on October 12, 2009, but such

review was denied on May 12, 2010. (Tr. 1-6). Claimant filed this action, which proceeded as set forth above, having exhausted his administrative remedies.

B.    Personal History

Claimant was born on November 11, 1961, and was thirty-four (34) years old on the onset date of the alleged disability and forty-seven (47) years old as of the date of the ALJ's decision. (Tr. 29). Under the regulations, Claimant was considered a "younger person" aged 45-49, and generally, one whose age will not "seriously affect [Claimant's] ability to adjust to other work." 20 C.F.R. §§ 404.1563(c), 416.963(c) (2010). Claimant passed the general educational development exam in 2005 and has prior work experience in the field of construction and as a laborer. (Tr. 31, 112, 114).

C.    Medical History

The following medical history is relevant to the issues of whether substantial evidence supports the ALJ's finding that the Claimant could perform a range of sedentary work as well as the ALJ's credibility determination relative to the Claimant:

**Radiology Report, Marietta Memorial Hospital 12/19/97-4/22/99 (Tr. 156-158)**
12/19/97
-There is a grade I spondylolisthesis at the L5-S1 level noted on the plain radiographs and the present examination. The vertebrae themselves demonstrate normal signal intensity with no evidence of focal lesions such as fracture or bone edema.
-The T2 weighted images demonstrate slight dessication and early degeneration of the L4-L5 disks and degenerative disk disease at the L5-S1 level with a moderate posterolateral generalized disk protrusion which is more pronounced posterolaterally to the left. This could easily result in irritation of the exiting left nerve root and secondarily result in radiculopathy. This should of course be correlated to any clinical neurological symptomatology prior to any surgery.
-The remaining disk spaces are normally preserved. There is no evidence of spinal stenosis and the distal aspect of the spinal cord itself demonstrates normal signal intensity.
Opinion:
-Grade I spondylolisthesis at L5-S1 level.

-Posterior disk protrusion at L5-S1 level which is most pronounced to the left and results in some compromise of the left L5-S1 intervertebral foramen, this could result in radiculopathy of the exiting nerve root. Mild degenerative disk disease at L4-L5 level

4/29/99
MRI of the Lumbar Spine
Clinical Data: Low back pain radiating to L leg
-The lumbar vertebral bodies show no evidence of compression deformity. There is a grade I spondylolisthesis of L5 on S1. There is disc degeneration with mild disc protrusion centrally and to the left at the L5-S1 level. Disc protrusion also appears unchanged. There is disc degeneration with bulging of the disc at the L4-5 level. The remainder of the lumbar intervertebral disc show normal signal intensity without evidence of disc degeneration or protrusion.
Impression:
-There is disc degeneration with mild disc protrusion centrally and to the left at the L5-S1 level. There is no significant interval change. There is disc degeneration with bulging of the disc at the L4-5 level.

**Dr. Chandrasekhar, Office Treatment Records 9/19/06-10/19/07 (Tr. 159-171)**
9/9/06
History: Right knee injury with pain
-No fracture or malalignment is seen. No joint effusion is identified. If there is persistent pain or tenderness, a repeat radiographic series should be performed in five to seven days to exclude radiographically occult fracture.
Clinical History: 4-wheeler accident with chest wall pain
-The heart size is normal. Bibasilar atelectasis is present. The upper lungs are clear, with no pneumothorax
Impression: Bibasilar atelectasis

9/19/06:
CC: 4 wheeler wreck 11 days ago, chest bruised
Assessment: chest wall, (illegible)/severe myalgia, hypoventilation (illegible)
Plan: Duragine patch (illegible)

10/4/06:
Reason for Procedure: Chest wall contusion
-PA and lateral projections of the chest were obtained
-Cardiac and mediastinal silhouettes are within normal limits. No infiltrate or pleural effusion is seen. There are fractures at the anterior lateral right 5th and 6th ribs. No pneumothorax is seen.
Impression: Right 5th and 6th rib fracture

10/3/06:
CC: Rolled 4 Wheeler 9/8/06, chest pain

Assessment: Myalgia/ chest wall, contum/hypoventilate (illegible)
Plan: Vicodin T TID/soma BID (illegible)


11/2/06:
CC: C/o pain
Assessment: myofi(illegible) pain/chest wall (illegible)
Plan: continue (illegible) (illegible)/ ribs


9/28/07:
CC: f/u of neck pain
    -C/o rt. (Illegible) Hurt while turn left, pain (illegible) slup-up 3-4x/pm
Assessment:
    -S/p neck, (illegible) (illegible)
Plan:
    -naponsyn/BID (illegible)
9/14/07:
CC: Pain in neck, under arm and back upper pressure on left (fell 3 weeks ago)
Assessment: Cervical sprain/(illegible)/cervical radiology
Plan: TAB (illegible), BP/vicodin ES TID/somm


10/2/07
Indication: Injury and pain
    -The patient fell almost a month ago and now has soft tissue swelling of hte neck and
    shoulder area. AP and lateral views show no fractures or dislocation. There is
    straightening of the usual curvature but good posterior alignment. The interspaces are
    well maintained. C7 is grossly intact on both AP and lateral views. Soft tissues are
    unremarkable on both projections.
Impression:
    -AP and lateral views of the neck show grossly negative soft tissue and bony structures.
    There is some straightening of the usual lordotic curvature but otherwise no significant
    abnormality.


10/10/07
Reason for procedure: ST Swelling
    -CT neck for soft tissue
Indication: Soft tissue swelling on the left side of the neck
    -Axial soft tissue images from the sphenoid sinus level to the distal clavicles are
    evaluated with particular attention to the left side. I see no gross soft tissue masses. The
    gross soft tissues of the left neck appear to be comparable and similar to those of the right
    side.
    -The patient fell off a truck and now has a lump on the left side of the neck and related to
    the left axilla.
    -There is straightening of the usual curvature unchanged. Soft tissues and airway are
    within normal limits. I see no fractures or dislocation. There are very short cervical ribs.

There are minor dengenerative changes of the Luschka joint primarily on the left at C6-7.

Impression:

-CT scan of the soft tissues of the neck with particular attention to the left side are within normal limits.

-Stable cervical spine with minor degenerative changes and short cervical ribs. There remains good posterior alignment.

10/19/07:

CC: F/u CT scan neck swollen and pain.

Assessment: Cervical spondy (illegible), exray: cervical spine, CT scan: neck-o/c, no (illegible)

Plan: Refill (illegible)

**Dr. Schmitt, Consultative Examination Report 12/18/07 (Tr. 172-176)**

12/18/07:

HPI:

-The patient has a 20 year history of lumbar pain. CAT scan done in the past found HNP at L4/5 as well as disc disease all through his spine. He claims buckline of the left leg. The lumbar pain radiates to the left leg with buckling of the left leg. The lumbar pain radiates to the left leg with buckling and several falls. Pain Scale: 6/10 at the worst and 5/10 at the best. He alleges a disturbed sleep pattern due to the pain. He also alleges severe difficulty negotiating stairs or uneven terrain. He states he has arthralgias and pains of both hips on ambulation. There is no history of deformities nor has there been any heat, redness, swelling, enlargment, effusion, morning stiffness, or tenderness in any joint. The patient further alleges that bending, stooping, sitting or standing for prolonged periods aggravate the low back pain. The patient has had no significant relief by the use of NSAIDS or opiates. He sustained an injury in 1986 when he injured the lumbar spine while lifting a heavy object at work. No surgery has been performed.

Physical Examination:

-General: reveals an alert, oriented, well developed, well nourished, white, 46 yo male in no apparent distress.

-Vital Signs: BP left arm 138/78, pulse 66, respirations 16, weight: 195 lbs.

-Neck: symmetrical and supple. There is no thyromegaly. Carotid upstrokes are normal. There is no jugular venous distention, no adenopathy, and no bruits.

-Chest: Symmetrical

-Back: reveals no kyphosis or scoliosis

-Lungs: Respiratory rate and movements are normal. Percussion and breath sounds are normal. There is no increase in AP diameter and no accessory muscles of respiration are used.

-Heart: PMI is at the 5th intercostal space in the midclavicular line. Rate and rhythm are normal. There is no enlargement of the cardiac outline. Auscultation fails to reveal any murmurs, gallops, clicks, or rub. The first and second heart sounds are of good tone and quality.

Neurological:

-Sensory systems: reveals decreased pinprick sensation at dermatome a +3 knee jerk on

6

the right and +4 on the left, +1 ankle jerk on the right and +2 ankle jerk on the left. Motor system: examination reveals no muscular atrophy or wasting. Muscle strength, size and tone are adequate.

Musculoskeletal:

-The patient limps slightly on the left. There is no leg length difference and no deformities of the spinal column and no sciatic notch tenderness. Straight leg is positive on the right at 30 degrees and on the left at 40 degrees in both sitting and supine positions. The patient gets on and off the table with mild difficulty. Heel and toe, squatting, and hopping movements are carried out with severe difficulty. The range of motion is free and full in all joints with the exception of the lumbar spine where ventral flexion is limited to 20 degrees, dorsal flexion 10 degrees, lateral motions 20 degrees respectively.

Summary, evaluation and Impression:

-The patient has a history of severe degenerative disc disease of the lumbar spine and a background of severe injury to the spine in a work accident. His range of motion is severely limited of the lumbar spine.

-Severely decreased range of motion of the lumbar spine for activities of everyday living; multiple arthralgias, chronic low back syndrome, chronic low back syndrome; severe lumbar strain with left radiculopathy.


**Dr. Porfirio Paascasio, Physical RFC Assessment 1/14/08 (Tr. 177-184)**

Primary Diagnosis: HNP L4-5/multiple arthralgias

Secondary Diagnosis: Chronic LBP Syndrome/HBP

Exertional Limitations:

-Occasionally lift and/or carry 20 pounds

-Frequently lift and/or carry 10 pounds

-Stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hr workday

-Sit (with normal breaks) for a total of about 6 hours in an 8-hr workday

-Push and/or pull (including operation of hand or foot controls is unlimited, other than as shown for lift and/or carry

Postural Limitations:

-Occasional: Climbing ramp/stairs; balancing, stooping, kneeling, crouching, crawling

-Never: climbing ladder/rope/scaffolds

Manipulative Limitations:

-None established

Visual Limitations:

-None established

Communicative Limitations:

-None established

Environmental Limitations

-Avoid concentrated exposure to:

*extreme cold or heat

-Unlimited Exposure to:

*Wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation,

hazards

Symptoms:

"Some allegations are not supported by medical evidence, therefore, he is only partially credible."

Additional Comments:

-ADL: In pain, but takes care of personal needs, does not cook or do chores, does not drive, no shopping, can't lift, Dr. Told if disc slipped he could be paralyzed, can walk 10 yards then rest 15-20 minutes, uses can every now and then

-PPQ: low back, no meds, can't find a Dr.


### Dr. Cindy Osborne, Physical RFC Assessment (Tr. 185-192)

Primary Diagnosis: Lumbar disc disease w/chronic pain

Secondary Diagnosis: HTN

Exertional Limitations:

-Occasionally lift and/or carry 20 pounds

-Frequently lift and/or carry 10 pounds

-Stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hr workday

-Sit (with normal breaks) for a total of about 6 hours in an 8-hr workday

-Push and/or pull (including operation of hand or foot controls is unlimited, other than as shown for lift and/or carry

Postural Limitations:

-Occasional: Climbing ramp/stairs; climbing ladder/rope/scaffolds, stooping, kneeling, crouching, crawling

-Never: balancing

Manipulative Limitations:

-None established

Visual Limitations:

-None established

Communicative Limitations:

-None established

Environmental Limitations

-Avoid concentrated exposure to:

*extreme cold, hazards

-Unlimited Exposure to:

*extreme heat, Wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation

Additional Comments:

-46 Y.O alleges back problems-Crack in L-4 vertebrae, See prior PRFC dated 1/14/08, the only new MER is 2 MRI reports which Claimant submitted rom 1997 and 1999.

-Complaints are partially credible as not entirely supported by MER. Decrease RFC to light with limitations as indicated.


### Dr. Chandrasekhar Office Treatment Records 9/14/07-12/16/08 (Tr. 193-208)

**9/14/07:**
CC: Pain in neck, under arm and back upper pressure on left (fell 3 weeks ago)
Assessment: Cervical sprain/(illegible)/cervical radiology
Plan: TAB (illegible), BP/vicodin ES TID/somm

**9/28/07:**
CC: f/u of neck pain, hurts while turning left, pain, in neck, sslup-up 3-4 x/pm
Assessment: S/p neck, (illegible), (illegible) neck sprain/strain/ myalgia (illegible)
Plan: naponsny/BID (illegible) (illegible) TID

**10/19/07:**
CC: F/u CT scan, neck swollen and pain
Assessment: Xray: cervical spine-(illegible), CT scan-neck o/c, no soft tissue
        -Cervical sprain/som/s/p (illegible) (illegible), HTN
Plan: Refill (illegible) (illegible)

**1/21/08:**
CC: F/u on regular appointment/ bad headaches, home (illegible)
Assessment: Cervical sprain/strain/ myolgia (illegible)
Plan: illegible, illegible, illegible 100/3-1/2-1/2 BID, Neurotin 200 BID

**3/21/08:**
CC: waiting for paperwork for MRI scheduling A OVMC back, RTC- 2 months, thumb swollen
and painful L thumb, head feels swimmy
Assessment: HTN/ Cervical disc (illegible)
Plan: refill (illegible), continue (illegible)

**4/8/08:**
MRI cervical spine
Indication: Neck pain radiating to the left arm
Findings:
        -Multiple views of the cervical spine demonstrate no evidence of fracture or dislocation.
        There is degenerative change and disc space narrowing at the C4-5 through C6-7 levels.
        There is degenerative change of hte facet joints as well. The signal intensity of the
        cervical spinal cord is unremarkable.
        -At the C2-3 level, there is no HPN, spinal stenosis or neural formainal stenosis.
        -At the C3-4 level, there is a right neural forminal stenosis secondary to degenerative
        spur and facet hypertrophy. No spinal canal stenosis is noted.
        -At the C4-5 level, there is a left neural foraminal stenosis secondary to degenerative spur
        and facetal hypertrophy. No spinal canal stenosis is noted.
        -At the C5-6 level, there is no HNP, spinal stenosis or neural forminal stenosis.
        -At the C6-7 level, there is disc bulging and 3mm central disc protrusion. NO spinal
        stenosis is noted.
        -At the C7-T1 level, there is 3 mm central disc protrusion. No spinal canal stenosis is

noted.

Impression:

1. Degenerative Changes of the cervical spine as described above.
2. Right neural foraminal stenosis at the C3-4 level
3. Left neural foraminal stenosis at the C4-5 level
4. 3 mm central disc protrusion at the C6-7 and C7-T1 level

MRI Lumbar Spine

Indications: back pain

Findings:

-Multiple views of the lumbar spine demonstrates no evidence of fracture or dislocation. There is advanced degenerative change and disc space narrowing at the L5-S1 level. There is grade 1 anterolisthesis of the L5-S1 level to about 4 mm. There is also bilateral pars defects at the L5 vertebrae. There is degenerative change of the facet joints as well. There is a 2.3 cm hemangioma at the L4 vertebrae. The conus is in its normal position. Incidentally, there is a cystic nodule noted within the subcutaneous fat at the left lower back at about the L4 level. It measures about the L4 level. It measures about 2.5 cm. It could represent sebaceous cyst versus other process.

-At the L2-3 and L3-4 levels, there is no HNP, spinal stenosis or neural foraminal stenosis noted.

-At the L4-5 level, there is disc bulging and 5 mm central disc protrusion. This impinges on the anterior thecal sac. There is no spinal or neural foraminal stenosis noted.

-At the L5-S1 level, there is no spinal stenosis noted. However, there is bilateral neural foraminal stenosis secondary to disc bulging, degenerative spur and facetal hypertrophy. The disc could impine on the bilateral L5 nerve root.

Impression:

1. Degenerative changes of the lumbar spine as described above at the L5-S1 level. There is grade 1 anterolisthesis of L5-S1 level with bilateral pars defect at the L5 vertebrae.
2. 2.5 cm cystic focus within the subcutaneous fat at the lower back as described above could represent sebaceous cyst vs. other process.
3. Disc bulging and 5 mm central disc protrusion at the L4-5 level. The disc impinges on the anterior thecal sac.
4. Bilateral neural foraminal stenosis at L5-S1 as described above. The disc could impinge on the bilateral L5 nerve root.


6/23/08:

CC: RTC-3 months, MRI-cervical spine

Assessment: Cervical forminal stenosis (illegible)/ (illegible)

Plan: PT Dr. Neuroswerzuth (illegible)/ (illegible)


10/1/08 (by Dr. Terrrence D. Julien):

Physical Exam: Upon physical exam, vital signs are stable. He is afebrile at 98.1, pulse 72, weight 192 pounds. Well nourished, well developed, in no apparent distress. Strength 5/5 without giveaway. Sensation intact. Deep tendon reflexes are hyperreflexive. Toes are downgoing. Negative clonus. Negative Hoffmann. Positive straight-leg left.

Assessment: Grade 1 L5-S1 spondylolisthesis
Plan: The natural history of spondylolisthesis with treatment plans, including surgery was given
      to patient. Patient would like to think about having a surgical procedure in the future but
      does not wish to have one now. He may return back to office on a p.r.n. basis.

12/16/08:
CC: RTC/HTN
Assessment: HTN/(illegible)/ (illegible)/ (illegible)
Plan: Loprazan (illegible)

WV Dept. Of Health and Human Resources, Physician's Summary
-Date of last patient contact: 3/21/08
-Diagnosis: Spinal stenosis, disc protrusion @ C6, C7-T1, degenerative Disc disease at L5-S1,
Anteriotisthesis of L5-S1, Pars Defect at L5, disc bulge at L4-L5 and foraminal stenosis
-Prognosis: guarded
-Length of time incapacity is expected to last: 1 year
-Employment limitation: all work
-Cannot care for children under age 6
-Not necessary for someone to stay in home with Claimant on a substantially continuous basis

**Sistersville General Hospital ER & Outpatient Records 10/12/2001-9/11/06 (Tr. 209-243)**
CC: pain in right foot
HPI: 39 yo male was involved in auto accident 2 days ago. He states that he was the restrained
driver of a vehicle involved in a single-vehcile MVA, car vs. tree. He states that he tried to
brake, but hit the tree, and he has had pain in the foot ever since. He had applied ice to the area,
but hte foot seems to still be hurting a lot, and he has significant swelling. He denies other
injuries. He denies having had loss of consciousness, headache, or neck pain.
Social history: He is a significant cigarette smoker
Physical examination:
      -On exam, he is awake, alert, pleasant and not in distress. He is in good general
      condition. HEENT is normal,. Neck is supple. Lungs have a few rhonchi. Heart, sinus
      rhythm. The abdomen is soft and nontender. Extremities-the patient does not have
      significant swelling at the right foot area, with much tenderness. Capillary refill is
      normal. X-rays show fracture of the distal second metatarsal and proximal phalanx.
      -WE applied a posterior splint, gave him crutches, and gave him vicodin. We gave him a
      prescription for 12 vicoprofens, to take 1 every 6 hours as needed.
Diagnosis: 1. Fracture, right foot.

Radiology Consultation Report:
      -Clinical information: ER presentation with history of MVA, presenting with pain
      -There is a comminuted calcaneal fracture, which appears to involve the subtalar joint, as
      well as the posterior aspect of the calcaneus. CT of the calcaneus would yield a much
      more anatomic and accurate evaluation. There is loss of the normal calcaneal angles with
      slight pes planus. No additional fracture or dislocation is seen.

Impression:

- Comminuted calcaneal fracture which involves both the posterior aspect of the calcaneus, as well as, the anterior process and subtalar joint. CT of the calcaneus could be performed for further evaluation if clincally warranted.

3/31/03:

HPI: 41 yo male with back problem since 1997, injured (illegible) since then with a lot of back pain. MRI, CT scan (illegible), all done with MMH, WCH and a (illegible), now pain getting worse, no recent fall or injury.

Onset: back pain since 1997, worse since last week.

Assessment: lower back pain, normal gait, radicular pain, sensation intact, normal DTR's

Impressions: back pain, law

Disposition: home, f/u and spoke with Dr. (Illegible)

Instructions given to Claimant:

- Return to ER immediately if any further problems occur or your condition worsens
- Do not drive or use equipment.
- Follow-up care with doctor of your choice.
- Illegible

7/23/03:

Clinical History: pain in right elbow. Fell down steps. SOB

PA and lateral chest: Findings:

- The cardiac silhouette is not grossly enlarged. There is mild interstitial disease. No alveolar infiltrate. No pneumothorax.
- The heart size is normal. Bibasilar atelectasis is present. The upper lungs are clear, with no pneumothorax.
- Impression:
  - Bibasilar atelectasis

Right Knee Series:

History: right knee injury with pain. No fracture or malalignment is seen. No joint effusion is ID'd.

Right elbow Findings:

- Two views were obtained. No discrete fracture or dislocation is seen, though there may be minimal displacement of hte fat pads of the elbow joint. Clinical correlation is recommended. If pain persists, a f/u exam in 7-10 days may be of further use.

CC: c/o pain across chest/ribs and Right knee from "4 wheeler accident" at approx 8pm last night. Patient was climbing a hill on a 4-wheeler when it rolled over backwards on top of him. He is c/o chest pain and right knee pain and has a small laceration on his right knee.

RN Notes/time:

- Rt and ER (illegible), further (illegible), (illegible)

Nursing Diagnosis:

- alteration in comfort, altered mobility, cardiovascular is normal
- Medication: (illegible)
- Xray: palat CXR, right knee

Instructions given:

- -return to ER if any further problems occur or condition worsens
- -do not drive or use equipment
- -follow up care with Dr. Galligan
- -Cold compresses to chest/back

Diagnosis:

- -Blunt Trauma to chest/back

<u>7/28/03:</u>

CC: c/o fell down 3 steps at 7:30pm, c/o of pain

- -states had 3 beers

RN Notes: pt. hoOx3, (illegible) (illegible) (illegible), Patient informed of need for CT scan. Resting on CAT, Patient stated he didn't want to wait for CT, he wanted to leave and Dr. (Illegible) discharged. Patient was adviced of hte need for CT and risks of not getting further evaluation. Patient still stated he wanted to go home now, AMA firms signed. D/c instructions given, verbalized understanding home-car-family.

<u>Radiology Consultation Report</u>

Lumbosacral spine:

- -Lumbar vertebral body heights are maintained. There is loss of disc space at L5-S1. There appears to be a spondylolysis bilaterally at L5 with a mild grade I anterolisthesis of L5 on S1. The S1 joints are unremarkable. Minimal osteophyte formation is seen throughout. Vascular calcifications are noted.

Impression:

- -Arthritic changes. Spondylolysis at L5 with anterolisthesis of L5 on S1.

<u>4/29/99:</u>

(entire exam report is illegible/too small to decipher)

**<u>Wetzel County Hospital ER & Outpatient Records 1/16/99-3/12/09 (Tr. 244-294)</u>**

(Some medical records from Tr. Pg. 288-293 were too difficult/illegible to decipher)

<u>9/29/97:</u>

PDC Level of Occupation: heavy

Current PDC level: light

- -lifting occasionally-20 lbs
- -lifting frequent-8 lbs
- -lifting constant-4 lbs

Pre-test pain level: 3.4/10

Post-test pain level: 6.4/10

Recommendations: Initial physical therapy to address fractured ankle and reported shattered heel on Right lower extremity. Initial work to conditioning to address functional deficits to allow return to work after physical therapy treatment has ended.

Material Handling Skills:

    Claimant was able to maximaly lift 20lbs from floor to knuckle, which correlates to a light PDC level. While completing material handling skills, Claimant lifted primarily with his legs, however, he had difficulty assuming proper positioning secondary to heel and ankle impairment. Claimant's blood pressure was monitored throughout this, with very little fluctuation in his BP during these activities

Cardiovascular Endurance:

    -An attempt was made to test Claimant to determine his current cardiovascular fitness level using the Modified Balke Cardiovascular Treadmill Protocol. Claimant was unable to tolerate the 1.0 mph speed on the treadmill and this test was unable to be completed. He reported he was unable to complete due to heel and ankle pain.

<u>11/15/99</u>-Pain Questionnaires

Pain now: 3,

Best day: 2

Worst day: 6

Pain as bad as it could be: 3.4/10

Not at all:

    -dizziness, blurring of vision, feeling faint, stomach churning, mouth becoming dry, muscles twitching and jumping, tense feeling across forehead

A little/slightly:

    -feeling hot all over, sweating all over, nausea, pain or ache in stomach, muscles in neck aching, legs feeling weak.

Whole leg sometimes becomes painful, goes numb, gives way sometimes; does not get pain at the tip of tail bone and has had no spells with very little pain

<u>10/16/03:</u>

History: trauma, bruise under left eye and above the right eye

Technique: CT scan of the facial bones was performed. Images were reviewed axially and coronally.

Findings:

    -There is an air fluid level in the left maxillary sinus. Subcutaneous air is seen in the soft tissues overlying the left maxillary sinus. There is a fracture of the anterior left maxillary sinus wall. This is minimally displaced into the sinus. There is also a fracture of the inferior orbital wall on the left. The inferior rectus muscle extends along the fracture fragment that is displacing to the left maxillary sinus. Correlate clinically for any signs of entrapment. There is also comminuted fracture of the superior nasal spine. No other fractures or bone destruction are seen.

Impression:

    -Comminuted fracture of the anterior left maxillary wall and fracture of the left inferd-orbital wall is also seen. The inferior rectus muscle lies on the superior margin of the fracture fragment of the inferior left orbital wall. This fracture fragment is slightly displaced into the left maxillary sinus. Other bone fragments of the anterior wall also displace into the left maxillary sinus. There is air fluid level in the left maxillary sinus

and air in the subcutaneous tissues along the left maxillary sinus.

CT Brain:
    -Findings: There is no intra or extra axial hemorrhage. The ventricles and cerebral sulci are normal. There is no mass effect or shift. There is no focal infarction. There is no depressed skull fracture.
    -Impression: No evidence of acute intra-cranial injury

Cervical Spine CT:
History: Trauma
Impression: no evidence of fracture

Chest CT:
    -There is a nodular density at the right base. This most likely just represents superimposition of shadows. Short interval follow up PA and lateral view of the chest with oblique views of hte chest are recommended. No other focal consolidations, masses, nodules, pleural effusions or pneumothorax are seen.
    -Impression: Nodular density seen at the right base most likely just represents superimposition of shadows. F/u as discussed above is recommended.


10/4/06:
Admitting Diagnosis: contusion of chest wall
Admitting Service: Xray OP
    -PA and lateral projections of the chest were obtained
    -Cardiac and mediastinal silhouettes are within normal limits. No infiltrate or pleural effusion is seen. There are fractures at the anterior lateral right 5th and 6th ribs. No pneumothorax is seen.
    -Impression: Right 5th and 6th rib fracture


10/2/07:
Admitting Diagnosis: swelling in head and neck
Admitting Service: Xray OP
    -Cervical spine
    -Indication: injury and pain
        *The patient fell almost a month ago and now has soft tissue swelling of the neck and shoulder area. AP and lateral views show no fractures or dislocation. There is straightening of the usual curvature but good posterior alignment. The interspaces are well maintained. C7 is grossly intact on both AP and lateral views. Soft tissues are unremarkable on both projections.
    -Impression:
        *AP and Lateral views of the neck show grossly negative soft tissue and bony structures. There is some straightening of the usual lordotic curvature but otherwise no significant abnormality.

10/8/07:
Admitting Diagnosis: swelling in head and neck
Admitting Service: Lab OP

10/10/07:
Admitting Diagnosis: Swelling in head and neck
Admitting Service: Xray OP
Indication: Soft tissue swelling left side.
　　　-Patient fell off a truck and now has a lump on the left side of the neck and related to the
　　　left axilla. AP and lateral views are compared with previous study of 10/2/02. There is
　　　straightening of hte usual curvature unchanged. Soft tissues and airway are within normal
　　　limits. I see no fractures or dislocation. There are very short cervical ribs. There are
　　　minor degenerative changes of the Luschka joint primarily on the left at C6-7.
Impression: Stable cervical spine with minor degenerative changes and short cervical ribs. There
　　　remains good posterior alignment.
CT neck for soft tissue:
　　　-Reason for procedure: ST swelling
　　　-Indication: soft tissue swelling on the left side of the neck. Axial soft tissue images from
　　　the sphenoid sinus level to the distal clavicles are evaluated with particular attention to
　　　the left side. I see no gross soft tissue masses. The gross soft tissues of the left neck
　　　appear to be comparable and similar to those of the right side.
　　　Impression:
　　　　　　-CT scan of the soft tissues of the neck with particular attention to the left side are
　　　　　　within normal limits.


3/12/09:
Admitting Diagnosis: hypertension NOS
-Admitting Service: Lab OP


**Hatmaker Chiropractic Center Evaluation Report 5/19/98 (Tr. 295-299)**
5/19/98
History: Claimant stated while working, he and another employee were pushing a bale of
　　　garbage to a truck for removal. When they were picking up the bale to put it into the
　　　truck, the other employee's ankle gave out and let go of hte bale. Claimant was
　　　subsequently left supporting the bale by himself. He stated that he tried to push the bale
　　　into the truck himself and that was when he hurt himself. He stated he was in immediate
　　　intense pain.
Physical Examination:
　　　-The 5' 6" tall patient weighed 188 lbs. Patient seemed initially very nervous and stated
　　　that his blood pressure was normally elevated when he saw a doctor. However, he did not
　　　know what his blood pressure normally ran. Claimant ambulated with a slight limping
　　　gait. He was stable at station and did not require any ambulatory aid, though he did wear
　　　a lumbar support initially. When ask to remove the support for the examination, he did so
　　　readily and stated he didn't see that it made much difference but had been advised by Dr.
　　　Ansli to wear it.
　　　-Patient seemed uncomfortable in supine and sitting positions and length of time. Prone
　　　position was extremely painful for patient and he was reluctant to remain in that position

16

for any length of time.

-Examination of cervical spine revealed some tenderness upon palpation in C6-C4 region mainly on left side without paravertebral muscle spasm. Three consecutive measurements of cervical flexion, extension, lateral flexion and rotation revealed: Flexion 40 degrees, extension 40 degrees, left lateral flexion thirty-five degrees, right lateral flexion 40 degrees, left rotation sixty degrees, right rotation seventy degrees. There was pain elicited by extension, left lateral flexion and left rotation.

-Patient stated that he had numbness in the posterior aspect of his left arm and had since the accident. I could find no reference to that in any of the microfilm records I reviewed and since that was not the main thrust of this examination. I did only a cursory examination of his cervical spine. If there are additional areas of injuries he sustained in the accident, I will leave that to his treating physician to documents and correct Claimant's diagnosis for this injury.

-Examination of the dorsolumbar spine revealed vertebral tenderness at L3-L5 with paraspinal muscle tenderness at L3-L5 but no paraspinal muscle spasm present. Left sacroiliac joint and surrounding area revealed some tenderness but no muscle spasm was noted. The patient was able to walk in a normal fashion without a limp but seemed to have difficulty when rising from a seated position. There was no evidence of any major scoliosis. He was unable to walk on his heels, toes, or walk heel to toe. He was able to squat fully with difficulty and stated it increased his pain level.

Conclusions & Recommendations:

-Claimant has a compensable injury which he obtained while working. There is substantial evidence from my examination and MRI findings that the claimant has lumbar disc displacement with radiculopathy. Dr. Ansli stated that surgery may be needed for correction of the protrusion at L5-S1. Based on my experience and the preponderance of scientific research, Claimant would not be a candidate for surgery at this time. In the majority of cases disc protrusion are self limiting and heal themselves with conservative care, which I recommend be continued in this case. Based on his prior job description, he is not able to return to that type of work at this time nor is he able to work in any capacity at this point. TTD should be continued at this time.

**Dr. Reza Asli Follow-up Examinations 4/3/98-6/8/98 (Tr. 300-302)**

4/3/1998:

On examination today Claimant had marked limitation of ROM of the lumbar spine. The hyperextension actually increasing his pain. When the pain is increased he gets some numbness in the left buttock and down the left leg. Forward bending was markedly limited and he could bend only up to 45 degrees. That also increased his pain. He had percussive tenderness over the L5 spinous process and both paravertebral muscles at the lumbar region. Straight leg raising was negative bilaterally. However, movements of the hip and knee on both sides seem to increase his pain. Motor examination was within normal limits and also the sensory examination. Examination of deep tendon reflexes reveal that the knee jerks were 2+ and symmetrical. The ankle jerks were 1+ and symmetrical bilaterally.

-Claimant has an acute lumbar strain on the top of already existing spondylosis and spondylolisthesis. This condition perhaps would cause some degree of delay in the recovery. The

chances are that Claimant may not be able to get back into any kind of heavy labor work. The treatment for now since this is only grade one is external stabilization. I have him a prescription for a chair back brace which he has to wear all of the time when he is up.


6/8/1998:

-Originally gave Claimant a prescription for Knights brace or a chairback brace but the back brace he is wearing is something different and he is very uncomfortable with it and he states that it increases his pain. I told him to take that off and I gave him another prescription for him to get the right kind of brace. Claimant has had follow-up xrays of his lumbar spine and there has not been any change on the listhesis. He is very nervous and shaky and his muscles are very tense and that apparently contributes quite a bit to his pain and symptomatology.

-On examination, he still has significant limitation of range of motion of the lumbar spine. I don't think that he is ready to resume the kind of work that he does as a handyman. He is coming back in three months for a follow up.

**Reynolds Memorial Hospital ER Records 9/10/98 (Tr. 303-305)**

9/10/98

History & Physical:

      -Talk to Dr. Arlis about C/o back pain. He said to go to ER of choice. C/o back pain severe today. Used ice today and no relief. Left leg weakness.

Diagnosis: (illegible) (illegible)

Treatment: (illegible) (illegible)

CC: back pain, severe pain in lower back, difficult to walk. Light headed, cold. Was putting ice on back, (illegible), off work since then numbness. (Illegible) (illegible)

Patient Follow-Up Instructions

-continue present treatment. Patient verbalizes understanding of the instructions indicated above.


**Tri-State Occupational Medicine, Independent Medical Exam Report 2/3/99 (Tr. 306-319)**

History:

      -37 yo male with "low back injury"

      -Didn't go to ER, but did see Dr. Bloom and was diagnosed as having an acute lumbosacral strain and placed on Flexeril and Ibuprofen without improvement in symptoms

      -Patient has seen no other physicians for treatment and has never had an EMG. Patient states overall since the injury, the low back pain has worsened. He reports having sharp to dull low back pain 90% of the time. The pain radiates into the left hip, but not in the legs. He reports numbness and tingling in his left leg. He reports weakness and instability in his left leg especially when walking and has fallen because of this on one occasion seven or eight months ago. The pain is made worse by bending, stooping or lifting heavy objects. It is also made worse by prolonged sitting, standing or ambulation. The patient is uncertain as to whether or not [sic] the pain is made worse by coughing or sneezing. The pain is made worse by riding in a car. The patient uses a back brace, but not a heating pad or a bed board. He does use an ice pack on his back. He uses a TNS unit in therapy.

18

Physical Examination:

-patient is 5'5" tall and weighs 177 lbs in stocking feet. The patient is a young male with normal nutritional status and who ambulates with a slow antalgic limping gait. Claimant's gait is not lurching, unsteady or unpredictable. Claimant is stable at station and does not require an ambulatory aid. Claimant is uncomfortable in a supine and sitting position. The intellectual functioning and mental status are normal during the examination. There is intermittent facial grimacing.

-Examination of cervical spine reveals no tenderness or paracerebral muscle spasm. On examination of the spine, there is decreased lumbar lordosis. Three consecutive measurements of flexion of the lumbar spine are as follows: 1) true lumbar spine flexion is 40 degrees with a sacral flexion angle of 50 degrees. 2) true lumbar spine flexion is 40 degrees with a sacral flexion angle of 50 degrees. 3) true lumbar spine flexion is 35 degrees with a sacral flexion angle of 50 degrees. Patient is able to stand on one leg at a time, but with difficulty. There is mild lumbar paravertebral muscle spasm. There is also moderate tenderness in the lumbar region of the spine. Straight leg raising is diminished to 60 degrees on the right and 50 degrees on the left in the supine position. Straight leg raising is diminished to 80 degrees bilaterally in the sitting position. There is no evidence of leg shortening. Lateral motion of the spine is diminished to 20 degrees towards the right. This was verified on 3 consecutive measurements. Lateral flexion of the lumbar spine to the left is normal to 25 degrees with a sacral extension angle of 10 degrees. This was verified on three consecutive measurements. There is no tenderness on palpation of the hips. Range of flexion of the hips with the knees flexed is normal to 120 degrees bilaterally. Hypertension of the hips in the prone position is normal to 30 degrees bilaterally.

Impression:

1) Acute and chronic lumbosacral strain, post-traumatic, disc protrusion at the L5-S1 level by MRI scanning
2) Grade 1 spondylolisthesis at L5-S1

-Claimant has reached maximum medical improvement in regards to the injury of 9/29/97
-Claimant is not believed to be able to return to previous type of employment. It is recommended that Claimant receive a functional capacity evaluation followed by a work conditioning program if approved by his treating physician.


2/3/99:

Present History:

-cracked back, hurt disc occurred by lifting a 450 lb bail of trash
-pain is worse in back, left hip, left leg
-pain is when Claimant wakes up in the morning, in the middle of the night, mid-day, evening, lying, sitting, driving, bending, standing, walking and changing positions.

Low Back Examination:

-Inspection

*patient stands unassisted, no scoliosis, antalgic lean, and lumbar hyperlordosis, yes to lumbar hypolordosis

-Palpitation:

               *has vertebral tenderness/restriction, no coccyx tenderness, has sacral base and pelvis level

-Gait:
               *Does limp, but does not use assistive devices

-Squat:
               *Squats fully and rises without difficulty but does so slowly

-Motor Strength:
               Normal-hip flexion, extension, abduction, knee extension, flexion, ankle dorsiflexion, planter flexion, great toe extension, heel toe walk, toe walk

-Location of Pain:
               *stabbing pain in left side lower back and leg, stabbing pain in front left thigh and front left shin


**Marietta Memorial Hospital Radiology Reports 12/19/97-4/29/99 (Tr. 320-323)**

12/19/97
       -There is a grade I spondylolisthesis at the L5-S1 level noted on the plain radiographs and the present examination. The vertebrae themselves demonstrate normal signal intensity with no evidence of focal lesions such as fracture or bone edema.
       -The T2 weighted images demonstrate slight dessication and early degeneration of the L4-L5 disks and degenerative disk disease at the L5-S1 level with a moderate posterolateral generalized disk protrusion which is more pronounced posterolaterally to the left. This could easily result in irritation of the exiting left nerve root and secondarily result in radiculopathy. This should of course be correlated to any clinical neurological symptomatology prior to any surgery.
       -The remaining disk spaces are normally preserved. There is no evidence of spinal stenosis and the distal aspect of the spinal cord itself demonstrates normal signal intensity.

Opinion:
       -Grade I spondylolisthesis at L5-S1 level.
       -Posterior disk protrusion at L5-S1 level which is most pronounced to the left and results in some compromise of the left L5-S1 intervertebral foramen, this could result in radiculopathy of the exiting nerve root. Mild degenerative disk disease at L4-L5 level


4/29/99

MRI of the Lumbar Spine

Clinical Data: Low back pain radiating to L leg
       -The lumbar vertebral bodies show no evidence of compression deformity. There is a grade I spondylolisthesis of L5 on S1. There is disc degeneration with mild disc protrusion centrally and to the left at the L5-S1 level. Disc protrusion also appears unchanged. There is disc degeneration with bulging of the disc at the L4-5 level. The remainder of the lumbar intervertebral disc show normal signal intensity without evidence of disc degeneration or protrusion.

Impression:
       -There is disc degeneration with mild disc protrusion centrally and to the left at the L5-S1

level. There is no significant interval change. There is disc degeneration with bulging of the disc at the L4-5 level.

**Wetzel Co. Hospital Rehab Dept. Functional Capacity Evaluation Summary 11/13/97-11/15/99 (Tr. 324-333)**

9/29/97:

PDC Level of Occupation: heavy

Current PDC level: light

       -lifting occasionally-20 lbs

       -lifting frequent-8 lbs

       -lifting constant-4 lbs

Pre-test pain level: 3.4/10

Post-test pain level: 6.4/10

Recommendations: Initial physical therapy to address fractured ankle and reported shattered heel on Right lower extremity. Initial work to conditioning to address functional deficits to allow return to work after physical therapy treatment has ended.

Material Handling Skills:

    Claimant was able to maximaly lift 20lbs from floor to knuckle, which correlates to a light PDC level. While completing material handling skills, Claimant lifted primarily with his legs, however, he had difficulty assuming proper positioning secondary to heel and ankle impairment. Claimant's blood pressure was monitored throughout this, with very little fluctuation in his BP during these activities

Cardiovascular Endurance:

    -An attempt was made to test Claimant to determine his current cardiovascular fitness level using the Modified Balke Cardiovascular Treadmill Protocol. Claimant was unable to tolerate the 1.0 mph speed on the treadmill and this test was unable to be completed. He reported he was unable to complete due to heel and ankle pain.

**Ohio Valley Medical Center Hospital Records 7/28/99-9/19/01 (Tr. 334-347)**

7/28/99:

CC: injury to right ankle

HPI: Claimant states that he has been told that he has a herniated disc and "cracked back" at L4, L5, and S1. States yesterday he was walking down stairs when he had radiculopathy down his left leg that caused his leg to give way, and he fell, landing onto the right ankle, falling down approximately three stairs. He denies hearing any pops or cracks in the right ankle. He had immediate pain and swelling, and he went to the ER in Sistersville. It was noted that there was a fracture, and patient was sent to OVMC for further evaluation and care. Patient denied any other injuries in the fall. Denies loss of consciousness; denies any radicular type of pain down the left leg presently, or since the fall. Denies back pain today. He is admitted for further evaluation and treatment as an observation.

Physical Examination:

    Back: There is slight tenderness over the lower lumbosacral spine. Patient moves back away from examiner's hand when palpating this area. No obvious deformities. Nontender cervical or thoracic spine. No CVA tenderness.

Impression:
- Fractured right ankle

Plan:
- Patient is admitted to observation at this time for further evaluation and treatment per Dr. Weiler, and is scheduled for surgery today.

Lumbar Spine:
- AP and lateral views show first degree spondylolisthesis at L5-S1 with narrowing of that disc space. It is uncertain if there is spondylolysis at that level. Height of remaining interspaces and of all bodies is normal. Pedicles are intact.
- Impression: there is posterior malalignment at L5-S1. Oblique views should be done to evaluate for spondylolysis.


4/8/08:

MRI cervical spine

Indication: Neck pain radiating to the left arm

Findings:
- Multiple views of the cervical spine demonstrate no evidence of fracture or dislocation. There is degenerative change and disc space narrowing at the C4-5 through C6-7 levels. There is degenerative change of hte facet joints as well. The signal intensity of the cervical spinal cord is unremarkable.
- At the C2-3 level, there is no HPN, spinal stenosis or neural formainal stenosis.
- At the C3-4 level, there is a right neural forminal stenosis secondary to degenerative spur and facet hypertrophy. No spinal canal stenosis is noted.
- At the C4-5 level, there is a left neural foraminal stenosis secondary to degenerative spur and facetal hypertrophy. No spinal canal stenosis is noted.
- At the C5-6 level, there is no HNP, spinal stenosis or neural forminal stenosis.
- At the C6-7 level, there is disc bulging and 3mm central disc protrusion. NO spinal stenosis is noted.
- At the C7-T1 level, there is 3 mm central disc protrusion. No spinal canal stenosis is noted.

Impression:
1. Degenerative Changes of the cervical spine as described above.
2. Right neural foraminal stenosis at the C3-4 level
3. Left neural foraminal stenosis at the C4-5 level
4. 3 mm central disc protrusion at the C6-7 and C7-T1 level

MRI Lumbar Spine

Indications: back pain

Findings:
- Multiple views of the lumbar spine demonstrates no evidence of fracture or dislocation. There is advanced degenerative change and disc space narrowing at the L5-S1 level. There is grade 1 anterolisthesis of the L5-S1 level to about 4 mm. There is also bilateral pars defects at the L5 vertebrae. There is degenerative change of the facet joints as well. There is a 2.3 cm hemangioma at the L4 vertebrae. The conus is in its normal position. Incidentally, there is a cystic nodule noted within the subcutaneous fat at the left lower

back at about the L4 level. It measures about the L4 level. It measures about 2.5 cm. It could represent sebaceous cyst versus other process.

-At the L2-3 and L3-4 levels, there is no HNP, spinal stenosis or neural foraminal stenosis noted.

-At the L4-5 level, there is disc bulging and 5 mm central disc protrusion. This impinges on the anterior thecal sac. There is no spinal or neural foraminal stenosis noted.

-At the L5-S1 level, there is no spinal stenosis noted. However, there is bilateral neural foraminal stenosis secondary to disc bulging, degenerative spur and facetal hypertrophy. The disc could impine on the bilateral L5 nerve root.

Impression:

1. Degenerative changes of the lumbar spine as described above at the L5-S1 level. There is grade 1 anterolisthesis of L5-S1 level with bilateral pars defect at the L5 vertebrae.

2. 2.5 cm cystic focus within the subcutaneous fat at the lower back as described above could represent sebaceous cyst vs. other process.

3. Disc bulging and 5 mm central disc protrusion at the L4-5 level. The disc impinges on the anterior thecal sac.

4. Bilateral neural foraminal stenosis at L5-S1 as described above. The disc could impinge on the bilateral L5 nerve root.

## Charles McElaney, DC, Patient Daily Notes 10/22/97-12/21/05 (Tr. 348-382)

10/24/97
LEMS/lt US four L5 disc interspace with patient suffering suspected description (illegible) rotation displacement L5 anteridiothesis. (Illegible) (illegible)

10/29/97
EMS illegible, L-S transition RtSI, Right side Adjust. Sacral base adjust . Illegible, continue with plan with have rehab exercises to reeducate tissues.

10/31/97
Patient cancelled appoint saying "The woman who takes can't of his mother won't be in today, so he has to take care of his mother.

11/3/97:
L5 sacral focus for L5 spondylolesthesis. Sacral base adjust. T1-L1 for restricted ROM. Continue to monitor progress, consulted with patient employers offer light duty which is being taken into consideration.

11/7/97
Illegible
-focus oblique xray right left w/ noted spondylolisthesis I L5. May prove long standing in nature with exacubation of pre-existing condition. Patient ambulates well-unassisted at the time with full ROM. Focus trial RTW 11/10/97. (Illegible)

11/10/97

Patient reports a good deal of discomfort over weekend with maintaining seated position or upright ambulatory posture. Retake LAO. Illegible. Patient is to try RTW 11/11/97 as trial. Patient was concerned of RTQ today. For fear of exacubation, wanted to discuss with an officer. Illegtible.

11/11/97
-Patient called to advise he was up at 6:30 but his back hurt too bad to go to work. Pt also asked for pain mediation. He was advised to call his family physician.

11/12/97
-Closely monitor patient progress with primary fucus over L5-S1 level. EMS that (illegible). For further patient mobilization. Should symptoms persist, focus CT scan L5 spondule w/ illegible further compromise to a pre-existing condition. Illegible.

11/14/97
-Focus with extention off work to 11/24/97 c/o focus of soft tissue therapies illegible.

11/19/97
-L5 illegible with focus traction L5-S1 level. No traction patient repeats feeling nauseous leaving early

11/21/97
-Focus EmS/HT therapies over L5-S1 levels with patient base posterior for grade I Spondyl. Again focus RTW 11/24/97. Improvement on illegible.

12/5/97
-RTW was established for 11/24/97 and remains the same.
12/8/97
Patient reports no improvement to this point.

12/10/97
-rescheduled appointment.

12/15/97
-Patient reports EMS makes his left leg go numb. Stated he went to work this AM after waiting for the boss and his wift to show up for a few minutes, his leg went number and he went back home did not wait for boss to show up. Said there wasn't any need for him to stay at work with the numbness he couldn't do anything anyway. Also said they had hired two guys to do his job. Patient continues to report hyposthesia in lower extremity. Take patient off work today and consider MRI of L spinal in efforts to further assess this matter.

12/22/97
-Consult MRI report. Focus traction 85# 10 minutes. (Illegible)

12/29/97
-Continue focus (illegible) and tarction 2-5 transition for L5 disc protrusion noted on MRI continued

12/31/97
Patient had an appt with attorney at 10:30. Couldn't stay for ex or US was 10:26 when he left.

1/2/98
Tx 44# 8 minutes patient reports soreness in left hip, most likely due to restless night. No spinal adjust at this time.

1/5/98
58# 8 minutes, further consult with patient with records indicating progress given to plan. Patient reports more soreness in his back today with improvement in lower extremity.

1/12/98
49# 8 mm with monitoring pt. progress. RTW extended

1/26/98
-EMS/Patient gentle mobilization T12-L1. Level in efforts to maximize ROM illegible

1/28/98
53# 8 minutes. Patient reports pain for more postural related at this time. Overall impairment ROM still restricted.

1/30/98
71# 8 minutes

2/2/98
L5 transition, focus DTR tt Bilat knee/ankle. Patient reports Saturday experiencing hyposthmia lower extre. (Left) w/ difficulties in walking, mild weakness noted on plantar flexion left/ dorsi-flexion. Continue focus traction for suspected illegible.

2/4/98
-Focus Ant T12-L1-L3. Sacral base adjust L5-gentle. Hold on traction today.

2/6/98
Patient stepped off porch yesterday on left foot aggravated low back afterwards. Sat in recliner all day. Focu adjust over L3-D. And T12-L1 levels today. Hold on base posterior continue illegible.

2/11/98
60# 10 minutes. Good progression, leg pain seem posturally related, intermittent.

2/13/98
-72# 10 minutes with heat US patient reports waking up mid night couldn't feel his legs.
Thought they were asleep. May refer ant to Dr. Asli for further consult.

2/16/98
66# 10 minutes Continue to monitor

2/18/98
Cancelled, getting teeth extracted. Reschedule

2/20/98
66# 10 minutes. Scheduling patient in PT followed by work illegible.

2/23/98
-Patient's wife called to cancel advising Claimant's leg went numb coming down steps, he went
down hitting lower part of back. Wife is putting ice on it. Reschedule.

2/25/98
26# 8 minutes, scheduling illegible followed by work illegible if possible.

2/27/98
-Cancelled

3/2/98
-DS

3/4/98
-Increased weakness left dorsiflex. Patient reports swelling left ankle following intial rehab.
Patient did not go to rehab today due to exacerbation of pain symptoms in testing.

3/11/98
53# 10 minutes

3/13/98
NS

3/16/98
Patient reports feeling little better today

3/18/98
-having 2 teeth pulled reschedule

3/20/98
-NS

3/23/98
64# 10 minutes, focus gentle amount mobilization over T9-T11. L1-L2

3/25/98
Cancelled

3/27/98
US only Did not wait for Tx

3/30/98
45# 10 minutes. Extend off work with scheduled appoint w/ Dr. Asli.

4/1/98
52# 10 minutes
-focus f/u adjust over T8-T12 to decrease lumbar spinal tension compromising illegible

4/6/98
-Illegible

4/15/98
-Scheduled to pick up backbrace tomorrow. Re xray 2 months illegible

4/17/98
-Patient says back continues to hurt. He pays no attention to it.

4/20/98
-continues no improvement

5/13/98
Patient reports going to Dr. Hatmaker DC on 5/7/98 for IME. Patient that time was illegible. He was instructed to see family Dr.  Dr. Blum was asked to get appt but would not see the patient.

5/15/98
-Continues bracing with scheduled appt dr. asli

5/18/98
-patient feeling some improvement today. Continues illegible.

5/22/98
-patient reports feet swelling is this due to the back brace?
-cannot see any ankle swelling, edema with pulse doral pedis strong, confirmed illegible.
Follwing exam illegible.

5/27/98
Appl. Late illegible update.

6/1/98
-Cannot retake lat L-Spine today

6/5/98
-No adjust. Scheduled mondya with asli

6/15/98
-dr. Asli requested new brace, chair back.

6/22/98
-Fears adjust over T10-T12, L1 for reduction of L5 compromised ROM.

6/29/98
-Focus ant adjust over T12-L1-L3 levels good motion. Waiting for brace.

7/1/98
-short consult. I feel patient continues to improve with ROM and + dimunition in pain, RTW extended

7/13/98
-using brace, patient reports unable to rest with brace sleep.

7/20/98
-no adjust, continues bracing

7/22/98
No spinal adjust.

7/27/98
illegible

7/31/98
numbness in left leg for 4 hours.

8/7/98
-patient going through divorce. Meetings with lawyer. Reschedule

8/12/98
-Illegible

8/19/98

-illegible

<u>8/21/98</u>
-illegible

<u>8/24/98</u>
-illegible

<u>8/26/98</u>
-No US due to brace

<u>8/31/98</u>
-illegible

<u>9/2/98</u>
continue to monitor

<u>9/9/98</u>
illegible

<u>9/10/98</u>
patient called to advise "as soon as he got out of bed, experienced solid, strong pain, not like
before. He has taken 2 vicodans. It has done nothing. Causes severe pain to get up and move.
This is the worst he has ever felt. Per CAM, instructed to apply ice 20 minutes on and off. Dr.
Asli suggested if no relief to report to the hospital for a shot for pain.

<u>9/11/98</u>
-Patient called to advise he went to hospital yesterday received an anit-inflammatory shot,
nubane shot. Didn't do a thing. Will keep scheduled appt.

<u>9/16/98</u>
-Continue with therapy as noted. Any problems in the future w/focus on Tx.

<u>9/18/98</u>
-Cancelled

<u>9/23/98</u>
-Patient reports feeling "not too bad" therapy only.

<u>9/28/98</u>
-Therapy only
-Patient having family problems, mother very ill, cancer

<u>10/12/98</u>

Patient reports continuing about the same. Too busy with mother to care for himself.

11/23/98
Patient reports no tx of any kind since last here.

12/2/98
-patient continues to remain stationary w/ no apparent relief

12/4/98
-Consult scheduled with Dr. Asli

12/7/98
-no adjust, focus therapies only

12/9/98
-illegible

12/23/98
-DTR-Bilat active. Patient is to rest over next 2 days with ice therapy. No sitting update Hat.
1/6/99
Patient reports going to Dr. Asli a few days ago. Was instructed to wear support when working or any activity. Can take it off at home while sitting. Contiue Tx w/ Dr. Illegible if anything suspicious should arise.

1/11/99
-accessible for US patient was not wearing brace

1/25/99
patient reports doing primarily the same (has cabin fever)

1/27/99
-focus scheduling in illegible. Patient reports doing better however fails to establish MMR/MORt and continues wearing brace.
1/29/99
-continue to monitor

2/9/99
-Patient scheduled for a one time consult with Dr. Payme. Patient to hand carry MRI films and xrays reports of finding to appt.

3/12/99
-Therapies no adjust, awaiting scheduled appt.

3/29/99

-NS

3/31/99
-Therapies only. Patient was seen by Dr. Paine. Fears update MRI L-Spine.

4/5/99
-RTW extended.

4/20/99
EM and MRI w/contrast scheduled

5/12/99
-Consented to patient 15-20' in EMT unremarkable and updated MRI noting no demonstrable
changes, patient's back is relatively stable.

7/23/99
- consultation, no adjust trying to schedule with neurosurgeon.

8/2/99
-Focus T6-T9, T12-L1, L3 adjust Ant. Good motion. Recent for Right ankle calcaneus.
Following fall down steps with patient reporting leg giving out due to weakness (left)

8/6/99
-Flex-dist. Manual. Ant T9-T12, L1, good motion. Extreme restriction of motion. Patient reports
falling again which has exacerbated lower spine.

8/9/99
-Scheduled with another Dr.

8/16/99
-Illegible

8/30/99
-NO reschedule, patient scheduled with another doctor
9/24/99
-Spinal adjust dorsal T3-T6, T10-T11, L1 levels

9/29/99
-Awaiting Dr. Payne's appt. RTW extended

10/15/99
-Spoke with patient illegible. Not wish to undergo surgery fears vocational rehab as discussed w/
patient.

10/22/99
-Requesting illegible for FCE at WCH

11/05/99
-focus scheduling cm for FCF vocation rehab? Illegible

11/10/99
Patient advised WCH lost paperwork, rescheduled appt. for 11/15/99. Patient scheduled here for 11/17/99.

11/29/99
-consult with patient, awaiting report recent FCE

12/3/99
-Consult FCE with patient. Do not recommend patient schedule for PT or reconditioning. Fears vocational rehab in patient showing interest in high school illegible, illegible.

12/13/99
-focus illegible therapies and consult only. Awaiting consult via illegible concerning vocational rehab.

6/10/02
-See exam history update
-Patient reports blood in stool, intermittent in nature over past 2 years. Check about blood, PSA
-Left para L spine cm with radicular symptoms on left lower extremity
-No surgeries
-Final Assessment:
        *CN illegible, breath sounds normal, reg lymphoma illegible, illegible, absent normal, DTR +1 left Achilles illegible,
-Treatment Plan: focus soft tissue therapies EMS/LT/illegible with primary focus over decompressive traction therapy. Ant adjust with holding or rotating adjustment, gentle only.

6/14/02
-Illegible, adjust over T9-T11, L1L3 level

6/30/02
-illegible, anterior T11, T12, severe illegible. General multi-level L spine ROM on exam. Moderate level tissue illegible. Patient requires more therapies on regular basis with spinal mobilization for aberant biomechanial illegible.

8/23/02
-NS

**University Health Associates Neurosurgical Consult Visit 10/1/08 (Tr. 383-385)**
<u>10/1/08 (by Dr. Terrrence D. Julien):</u>
Physical Exam: Upon physical exam, vital signs are stable. He is afebrile at 98.1, pulse 72,
weight 192 pounds. Well nourished, well developed, in no apparent distress. Strength 5/5
without giveaway. Sensation intact. Deep tendon reflexes are hyperreflexive. Toes are
downgoing. Negative clonus. Negative Hoffmann. Positive straight-leg left.
Assessment: Grade 1 L5-S1 spondylolisthesis
Plan: The natural history of spondylolisthesis with treatment plans, including surgery was given
to patient. Patient would like to think about having a surgical procedure in the future but
does not wish to have one now. He may return back to office on a p.r.n. basis.


**Dr. Chandrasekhar Medical Assessment of Claimant's Ability 7/8/09 (Tr. 386-402)**
<u>7/1/08</u>
-Medical assessment of Ability to Do Work-Related Activities
    *Lifting/carrying are affected by impairment
    *Maximum occasionally lifting up to 10 lbs
    *Maximum frequently lifiting up to 5 lbs
    *Standing/walking are affected by impairment
    *Can stand/walk total of 2 hours, without interruption, can stand/walk 10 minutes
        -supported by disc bulging and 5 mm central disc protrusion at L4-L5 level.
        Discimpinges on anterior theral sar. Bilateral neural forminal stenosis at L5-S1.
        Disc could impine on bilateral L5 nerve root.
    *Sitting also affected by impairment and can only sit for 2 hours or 15 minutes without
    interruption
    *Postural Acitivites:
        -Occasionally perform-balancing, stoop, crouch,
        -Never perform-climbing, kneeling, crawling
    *Environmental restrictions:
        -heights, temperature extremes, chemicals, dust, noise, fumes, humidity,
        vibrations
    *Manipulative Limitations:
        -Limited: reaching all directions (occasionally), handling (occasionally), fingering
        (occasionally)
        -Unlimited: feeling (constantly)
        -Patient has trouble reaching side to side and impossible to reach overhead. Hard
        to grasp anything with hands or fingers due to impairment. MRI results enclosed.
    *Visual/Communicative Limitations:
        -Unlimited: seeing, speaking
        -Limited: Hearing (tone deaf in left ear, not caused by this)
        -No pushing, pulling or prolonged standing. NO lifting over 10 lbs. Needs to
        avoid dusty environmentsm extreme temperature changes no exposure to
        chemicals, loud noises, fumes of any kind or vibrations due to physical and nerve
        pain. MRI results show impairment and supports these findings.

D.    Testimonial Evidence

Testimony was taken at the hearing held on May 15, 2007.  The following portions of the

testimony are relevant to the disposition of the case:

> ALJ: We're on the record this morning in the case of Mr. Larence Dale Cook. Mr. Cook is present and represented by Ms. Jan Dills. Also present is Ms. Cathy Spencer, the hearing reporter and Mr. Larry Beall, the vocation expert who will testify in this case.
>
>    *                    *                    *
>
> (The Claimant, Lawrence D. Cook, having been first duly sworn, testified as follows:)
>
> ALJ: All right, is Lawrence Cook your true name, sir?
>
> A: Yes
>
>    *                    *                    *
>
> Q Is your birth date 11?11/61?
> A Yes
> Q And you're 47 years old?
> A Yes, ma'am
> Q How tall are you?
> A 5'7"
> Q And how much do you weigh?
> A 178 pounds
> Q Are you married?
> A Yes, ma'am.
> Q Live with your wife?
> A Yes, Ma'am
> Q Any children in the home?
> A No, ma'am
> Q Do you have a driver's license?
> A No, ma'am.
> Q Have you ever had one?
> A Yes, ma'am
> Q What happened to it?
> A I lost it for a DUI
> Q When was your DUI?
> A '97-'98
> Q Are you eligible to get it back?
> A Yes, Ma'am
>
>    *                    *                    *
>
> Q Do you smoke?
> A Yes, ma'am
> Q About how much?
> A A couple packs a day.

34

Q When's the last time you had a drink?

A Probably about a week ago.

Q And do you use any drugs without a doctor's prescription?

A No, Ma'am.

Q How much are you drinking now?

A A couple of beers occasionally.

Q Do you have any source of income?

A No, ma'am. My wife gets $400/month unemployment.

Q Do you have a medical card or insurance?

A Medical card

Q And what is that, that makes you feel that you cannot do any type of work?

A I just feel like I can't go out and give a person's an honest day's work, because if I start doing something, I can't finish it, because I've got to move around, or I've got to sit down. If it gets to hurting too bad, I have to lay down. My legs want to go numb with me, and then I can't walk. I just feel that I can't give a person an honest day's job, honest day's work, and I've done that all my life.

Q How long have you been like that or felt that you couldn't work?

A Well since that accident happened in '97.

Q And when was the last time you worked?

A '97

Q What type of work were you doing then?

A Construction

Q What were your duties in the construction industry?

A Well, at La Master's we was doing separating plastics, cans, papers from bins, and putting them all in another bin that way they had all your white paper, your blue, your clear plastics, and dark plastics separated.

Q Did you have some kind of accident?

A Yes, Ma'am.

Q What happened?

A WE had been compressing the plastic all day long into a big bin, and then we had to band it, and roll it out to the platform and load it upon the back of a truck. And the guy that was working with me, we had flipped it up to put it on the truck, and his ankle give out, and the whole 700-800 pound deal rolled back onto me.

Q Okay. Were you hospitalized?

A I went to the emergency room that night, ma'am.

Q And how long were you in the hospital.

A They released me that evening.

Q Have you had any surgeries?

A No, ma'am.

Q Have you ever been hospitalized for your injuries at all?

A Yes, Ma'am

Q When?

A '85

Q Well, since 1997?

A No, ma'am.

Q Have you ever been to physical therapy?

A Yes

Q When were you last in physical therapy?

A 2000, I think, '99 or 2000.

Q Have you ever had any type of vocational training with the Dept. Of Rehabilitation or anything like that?

A No, ma'am.

Q Any referrals to them to retrain you for work?

A No, ma'am.

Q Have you sought any jobs since that time? Look for work of any kind?

A No, ma'am

Q Are you involved with the pain clinic of any kind?

A No.

Q Have you ever been?

A No.

Q Do you do any shopping for yourself?

A Me and my wife got to the store occasionally, yeah.

Q Any cleaning around the house?

A No, ma'am

Q Take any trips with family or friends?

A No.

Q Do any laundry?

A No.

Q Are you able to shower and take care of your hand?

A Yeah.

Q Any activities outside the home, such as clubs or church or anything like that?

A No, ma'am.

Q Do any cooking?

A No.

Q Any hobbies that help pass the time?

A None that I can do any more, no.

Q Do you visit with any friends or relatives?

A Occasionally.

Q Do you do any sweeping or vacuuming?

A no.

Q Do you get any form of exercise whatsoever?

A No, not really.

Q What is the doctor doing to treat your back or whatever?

A He's been giving me neurological medicine, blood pressure medicine, muscle relaxers, pain pills, and sleeping pills.

Q Have you ever been referred to a neurosurgeon or neurologist?

A Yeah, yeah.

Q When was that?

A I think Dr. Saycar did it January, February, March somewhere in there.
Q Who did you go see?
A I can't think of his name. It was over here at Wheeling Park. Julian, Julian.

*                         *                           *

Q What was his determination? (Referring to Dr. Julian)
Atty His determination that he needs surgery

*                         *                           *

Q And when did you see this doctor?
Clmt It was the early part of this, this year. I can't remember the exact date.
Q Okay. When are they planning to do surgery?
A He–they want to do surgery. He just –
Q Are you seeing a psychiatrist or psychologist?
A No, Ma'am
Q Are you attending any counseling at all?
A No ma'am
Q So you see your, your primary care physician?
A Yes, ma'am
Q And how often do you see him?
A Every three months
Q Do you have any side effects from your medication?
A Tiredness

(Examination of Claimant by Attorney)
Q How long have you been seeing Dr. Saycar?
A Since '06.
Q And how many times do you think you've seen her roughly?
A Seen him.
Q Seen him.
ALJ Is his Shandrasaycar?
Atty Yes

*                         *                         *

Clmt I, I don't know, I've seen him 10-12 times, maybe more. He was only having me go every six months, because we, we had to pay and everything until I got my medical card started, and then whenever I got my medical card started, he wants me coming in every three months, that way he can – I can keep him updated on how I'm feeling and –
Q And that brings up a good point, when did you, when did you get your medical card? You haven't had it the whole time.
A. NO, I've only had maybe a year, a year and four months
Q They gave it to you and they back dated it.
A Uh-huh. Uh-huh. There's a paper, an MRI that Dr. Saycar wanted done on my back.
Q And the reason Dr. – I mean did Dr. Saycar say why he referred you to a neurosurgeon?

37

A Well, I'm going by the MRI report and stuff like that, you know, he was saying, you know, that you needed to see one, because he – Dr. Saycar thought that I needed surgery, and he referred me to that Julian.

Q Okay. He also did an MRI on your neck that was from an injury in '06?

A Yes Ma'am

Q You've also injured– you have a pin in your ankle?

A I had a metal rod through my ankle until it stablized and they took it out.

Q All righ. Now how did you injure that?

A I was going down the steps out of my house and everything, and my leg give out on me, my left leg, and I went to the right, and I come down on my ankle, and it shattered my heel.

Q And that's been really a lot of your complaints is that left leg?

A Uh-huh. Yes, ma'am. Numbness, tingleness, just– I mean he can just be walking along and my leg will go numb.

Q Social security sent you to Dr. Schmidt?

A Yes, Ma'am.

Q Almost 18 months ago or actually a little longer than that. Do you recall going to him?

A Yes.

Q He did a full exam on you?

A Yes, ma'am

Q And then also then the other person you've been seeing is Dr. Saycar?

A Yes, ma'am

Q So you didn't have insurance from basically like '99 to 2008?

A Right

                    *                    *                    *

Q Okay. And Dr. Saycar's been prescribing you Vicodin and Neurontin for your pain?

A Yes, ma'am


(Reexamination of Claimant by ALJ)

Q Is there anything that we have failed to ask you about that you would like to tell us about?

A No, ma'am. Just I used to be an active person. I played volleyball, I played softball, and you know, I liked horseback riding and stuff like that, but I can't do any of that stuff any more. I mean I wouldn't even attempt to try it.

Q Have you been that way since 1997 that you were unable to do anything around the house?

A Yes, ma'am. Yes, ma'am

Q Or work at any type of job or participate in any type of activity?

A Since '97.

                    *                    *                    *

Atty: We have two prior applications, however, that doesn't, doesn't– he would

never be able to reopen those applications. I think really the, the important date here would be September, the date of application, September 10, '07. I don't have the protected filing date, I didn't have a final work CD available to me, but, but August '07 to present is what we believe would be a more appropriate onset date, even though he hasn't worked since '97, it's not–

ALJ: All right. Are you moving to amend the onset date to 9/10/07, which is his filing date, protected–

Atty: yes, Your Honor.

          *                    *                  *

ALJ All right, I will amend the onset date to 9/10/07 as, as requested. And I'll ask a few questions of Mr. Beall.


(The Vocational Expert, Larry Beall, having been first duly sworn, testified as follows:)

Q Have you reviewed this file?

A Yes, Your Honor

Q And have you discussed this case with anyone?

A I have not, Your Honor.

Q Are your credentials accurately stated in the file?

A They are.

Q Would you briefly explain to the claimant what the <u>Dictionary of Occupational Titles</u> is, how you utilize that reference book, and what region you're going to use in your testimony?

A Yes, Your Honor. The <u>Dictionary of Occupational Titles</u> is a reference work that's been compiled by the United States Department of Labor, it classifies jobs in the national economy, and it talks about the educational requirments, the physical demands, and the different tasks you must be able to, to complete in order to do the job successfully. The region we're using today is West Virginia, Eastern Ohio, Western Maryland, Western Pennsylvania.

Q All right. If you would please classify the claimant's prior relevant work, if you found any that was applicable?

A The, the dates were –seemed to be sketchy, but the– he had laborer job include carrying block and supplies, and that would be heavy and unskilled, Your Honor.

Q. All right. If you take a hypothetical person of the claimant's age, educational background, and work experience, and I believe the file indicates that you have your GED sir, is that correct?

Clmt Yes, Ma'am

ALJ Who can do a range of light work with occasional posturals, no climbing of ropes, ladders, scaffolds, or anything of that nature. Should avoid hazards such as dangerous moving machinery and unprotected heights. No kneeling or crawling required. Should avoid extremes of temperature. No more than occasional overhead reaching, or let's say no overhead reaching required. No constant, fine manipulation. And a sit/stand option. Could that hypothetical person perform the claimant's prior relevant work?

VE: No, your honor.

Q Are there any occupations in the economy at the light or sedentary level that such a hypothetical person could perform?
A Yes, Your Honor. At the light level– did you want the <u>DOT</u> numbers with this?
Q Please
A At the light level, office assistant, light, 150,000 nationally, 1,850 regionally, an example for a <u>DOT</u> is 239.567-010. Or laundry folder, light, 50,000 nationally, 650 regionally, and the <u>DOT</u> 369.687-018. At the sedentary level, a machine tender, 141,000 nationally, 1,400 regionally, a <u>DOT</u> for that would be 690.686-066. A general sorter, 50,000 nationally, 550 regionally, <u>DOT</u> 734.387-010.
Q All right. Do you have any jobs that would require less than a sedentary exertional level?
A No, Your Honor
Q If a person were to be off task due to pain or discomfort, how much time off task would generally be tolerated by an entry level employer?
A Depends on the work location. Somewhere between zero to nine percent, but once you hit double digits, if you're going to be off task ten percent or more of hte time, I believe that eliminates a competitive work routine at any level, Your Honor.
Q How much absenteeism is tolerated?
A If a person is going to miss two or more days, I believe the supervisory personnel would attempt an intervention, and if that were not corrected would result in termination.
Q Is your testimony consistent with the <u>Dictionary of Occupational Titles?</u>
A I believe it is, Your Honor
Q As to the sit/stand option?
A The sit/stand option is not addressed directly by the <u>DOT</u>, that's as a result of over 30 years of experience in working with people with disabilities and placing them in jobs.
Q All right. And what do you mean by sit/stand option as you have described it in these jobs?
A Well at the – to be able to stand primarily, but be seated to relieve pain or discomfort for a short period of time, just so it doesn't take them off task the ten percent. And also in these light positions it would be seated more than two hours out of the total day.

(Examination of Vocational Expert by Attorney)
Q: I'm going to hand you what had been previously submitted, but had not been admitted as an exhibit, and it's from Dr. Saycar dated 7/8/09. If you can take a look at that, basically a sedentary position with a limited sitting and a limited standing throughout an eight-hour day.
A Okay
Q With those limitations, would you be able to name competitive substantial gainful activities?
A No, the two, the two that are, that are right up front here, only two hours total

of     the day standing and walking and two hours total sitting, so that would only allow halftime or less work, and that wouldn't be at a competitive level.

       *             *             *

(The Administrative Hearing was concluded.)

E.      Lifestyle Evidence

The following evidence concerning Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how Claimant's alleged impairments affect her daily life:

- Has high blood pressure (Tr. 113)
- Lives with family (Tr. 116)
- Cannot sleep due to continuous pain (Tr. 117)
- Is able to dress, bathe, care for hair, shave, feed self, & use the toilet (Tr. 117)
- Does not do any household chores, indoor or outdoor due to continuous back pain (Tr. 118)
- Is unable to pay bills, count change, handle a savings account or use a checkbook/money order (Tr. 119)
- Goes outside once a day (Tr. 119)
- Does not have any hobbies or interests because of Claimant's back pain (Tr. 120)
- Does spend time with others (Tr. 120)
- Is able to talk on the phone everyday with others (Tr. 120)
- Cannot go out to socialize because of back pain (Tr. 121)
- Can walk 10 yards before needing to stop and rest (Tr. 121)
- Must rest for 15-20 minutes before Claimant can resume walking (Tr. 121)
- Is able to concentrate until the pain in Claimant's back gets severe (Tr. 121)
- Is able to follow written and spoken instructions until Claimant gets in severe pain (Tr. 121)
- Has not been fired or laid off from a job because of problems getting along with other people (Tr. 122)
- Is in fear because if the "disc moves I will be paralzyed" (Tr. 122)
- Uses a cane (not prescribed), glasses/contact lenses (prescribed in 2004) (Tr. 122)
- Has numbing in his legs because of Claimant's severe back pain (Tr. 123)
- Back has swelling, stabbing, numbness (Tr. 123).
- Has a fear of doing anything because of bulging and herniated discs (Tr. 123)
- Has continuous back pain that lasts all day (Tr. 124)
- Everyday activities, walking, standing, sitting, bending, stooping, sleeping makes Claimant's pain worse (Tr. 124)
- Nothing relieves Claimant's pain (Tr. 124)

### III.  The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant moves the Court to grant Claimant's motion for judgment on the pleadings due to multiple errors present in the ALJ's decision.  Claimant contends "the ALJ failed to comply with 20 C.F.R. § 404.1527 by failing to accord adequate weight to the opinion of the [C]laimant's treating physician or the examining physician." See Pl.'s Mot., Pg. 2 (Dkt. 9). Claimant argues the "ALJ erred as a matter of law in making a credibility finding which is not based on substantial evidence." Id.  Lastly, Claimant contends the ALJ's decision is deficient because the ALJ "failed to comply with SSR 96-7p in discrediting the [C]laimant for his failure to obtain treatment without first considering his explanations for his lack of treatment."  Id.

Commissioner contends substantial evidence supports the ALJ's finding that Claimant was capable of performing a range of light and sedentary work available in significant numbers in the national economy. See Def.'s Summ. J. Br., Pg. 2 (Dkt. 12).  Specifically, Commissioner argues the ALJ properly evaluated Claimant's treating physicians' opinions.  Additionally, Commissioner contends the ALJ's credibility determination of Claimant was proper because the ALJ "properly addressed [Claimant's]activities of daily living as one factor, but also considered inconsistencies in [Claimant's] testimony, actions, and statements to medical providers, [Claimant's treatment history, and her own observations." Id. at Pg. 11.  Commissioner addresses Claimant's last argument by asserting "the ALJ's consideration of [Claimant's] treatment history in conjunction with the medical evidence, the consistency of [Claimant's] statements, and [Claimant's] daily activities was reasonable and proper." Id. at Pg. 15.

B.    Discussion

This Court's review of the ALJ's decision is limited to determining whether the decision

is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3) (2010). "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 664-65 (1988); see also Richardson v. Perales, 402 U.S. 389, 401 (1971). The decision before the Court is "not whether the Claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 2001)). The ALJ's decision must be upheld if it is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3).

## 1.      Evaluation of Treating Physician's & Consultative Physician's Opinions

Claimant argues that the ALJ's decision was in error because the ALJ failed to accord adequate weight to the opinion of Dr. Chandrasekhar, Claimant's treating physician, or to Dr. Schmitt, the examining physician. Specifically, Claimant argues Dr. Chandrasekhar had "identified more than adequate evidence of a 'permanent intractably disabling back condition,' however, the ALJ...has not taken the evidence of record into consideration." See Pl.'s Mot., Pg. 4 (Dkt. 9). Claimant also contends that Dr. Chandrasekhar's opinion is supported by the consultative examination completed by Dr. Thomas J. Schmitt. Claimant, however, contends the ALJ "extracted only the parts of Dr. Schmitt's examination that supported denying [C]laimant benefits...[and] [] did not consider the examination as a whole." Id. at 5.

Commissioner argues the ALJ "properly weighed the opinions of [Dr. Chandrasekhar and Dr. Schmitt] in light of the evidence of record." See Def.'s Mot., Pg. 7 (Dkt. 12). Commissioner

contends the ALJ considered Dr. Chandrasekhar's opinion and found it was "not consistent with the objective medical evidence, [Claimant's] treatment history, and [Claimant's] activities of daily living." Id. at 8.  Regarding the ALJ's consideration of Dr. Schmitt's opinion, Commissioner argues that the ALJ afforded some weight to Dr. Schmitt's findings, but ultimately concluded the opinion was too restrictive and inconsistent with the record, "particularly [Claimant's daily activities...which did not support severe limitations." Id. at 10. Therefore, Commissioner argues, both opinions are due no particular weight because the opinions run counter to Claimant's activities, treatment history, and the other objective medical sources.

All medical opinions are to be considered in determining the disability status of a claimant.  20 C.F.R. §§ 404.1527(b), 416.927(b).  Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; and (5) whether the physician is a specialist.  20 C.F.R. § 404.1527(d)(2) (2010).  Courts often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001).  However, "although the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight." Id. (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). The opinion and credibility of claimant's treating physician is entitled to great weight but may be disregarded if there is persuasive

contradictory evidence. Evans v. Heckler, 734 f.2d 1012, 1015 (4th Cir. 1984).

Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources, when the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques, and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. §416.927(d)(2). See Craig, 76 F.3d at 590 (holding that a treating physician's medical opinion must be given controlling weight only when it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record). To decide whether the impairment is adequately supported by medical evidence, the Social Security Act requires that impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Heckler v. Campbell, 461 U.S. at 461; 20 C.F.R. §§ 404.1508; Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990).

Affording controlling weight to Dr. Chandrasekhar's opinion is inappropriate in this case because the ALJ found the opinion to be inconsistent with other substantial evidence in the case record. The ALJ throughly discusses her reasoning as to why she found Dr. Chandrasekhar's opinion to be "overly restrictive and not supported by the objective medical and other longitudinal evidence of record." (Tr. 16). First, the ALJ highlights that Dr. Chandrasekhar last examined the Claimant on March 21, 2008 and diagnosed Claimant with spinal stenosis. (Id.) The ALJ found that subsequently developed evidence rendered Dr. Chandrasekhar's opinion unreliable. Specifically, the ALJ found Dr. Terrence D. Julien's opinion and Dr. Thomas Lee's opinion cut against Claimant's allegations of an intractable, long-term disability. The ALJ also

45

considered Dr. Chandrasekhar's July 8, 2009 opinion and found it to be inconsistent with Claimant's ongoing daily activities such as Claimant's ability to "take care of his personal needs," "ride in a car," "occasionally go[] to the store with his wife and visit[] his family and friends." (Tr. 16). The ALJ's decision is replete with substantial evidence to support her determination to afford less than controlling weight to Dr. Chandrasekhar's opinion. See Evans v. Heckler, 734 f.2d 1012, 1015 (4th Cir. 1984) (finding opinion of claimant's treating physician may be disregarded if there is persuasive contradictory evidence). Accordingly, Claimant's argument, in this respect, is unpersuasive.

As to Dr. Schmitt's opinion, Claimant argues the "ALJ extracted only the parts of Dr. Schmitt's examination...and did not consider the examination as a whole." See Pl.'s Mot., Pg. 5 (Dkt. 9). The Court finds Claimant's argument to be without merit. First, the ALJ explicitly states that she "gave some, but no controlling weight" to Dr. Schmitt's findings. Second, the ALJ sufficiently explains her reasoning in this regard. The ALJ stated she believed Dr. Schmitt's findings were overly restrictive and inconsistent with Claimant's ongoing daily activities. (Tr. 18). The ALJ also proffered that, after examining Claimant's full record, the ALJ believed Dr. Schmitt's findings placed too great of weight on Claimant's subjective statements and, therefore, overstated Claimant's limitations. Moreover, the ALJ highlighted that Dr. Schmitt's findings was based on a "consultative examination [which] is merely a one-day 'snapshot' of the [C]laimant's subjective presentation and complaints...." (Id.). Dr. Schmitt is a consultative examiner and not a treating physician of the Claimant. As a consultative opinion, the ALJ is not required to provide controlling weight and may afford as little or as much weight as the ALJ deems the opinion requires. The Court believes the ALJ appropriately considered Dr.

Schmitt's opinion in full and adequately explained the weaknesses the ALJ perceived existed in the findings.  Accordingly, Claimant's argument must fail.

>    **2.      ALJ's Credibility Determination of Claimant & Compliance with SSR 96-7p**

Claimant makes two arguments. First, that the ALJ erred as a matter of law in making a credibility determination that is not based on substantial evidence because the ALJ improperly considered Claimant's daily activities. Second, that the ALJ did not comply with SSR 96-7p to discredit Claimant because she improperly used Claimant's unwillingness for surgery against Claimant.

In opposition, Commissioner contends the ALJ properly addressed Claimant's daily living activities as one factor in assessing Claimant's credibility but also considered "inconsistencies in [Claimant's] testimony, actions, and statements to medical providers, [Claimant's] treatment history, and [the ALJ's] own observations." See Def.'s Mot., Pg. 11 (Dkt. 12).  Additionally, Commissioner argues Claimant "fails to acknowledge that the ALJ considered [Claimant's] general failure to seek treatment" as "only one factor in the ALJ's credibility determination." Id. at 14.  Commissioner notes that SSR 96-7p "directs ALJs to consider explanations that a [C]laimant may provide or other information in the case record that indicates why a [C]laimant failed to seek treatment" in evaluating a Claimant's credibility and alleged symptoms.  Id.

The Fourth Circuit stated the standard for evaluating a claimant's subjective complaints of pain in Craig v. Chater, 76 F.3d 585 (4th Cir. 1996).  Under Craig, when a claimant alleges disability from subjective symptoms, he must first show the existence of a medically determinable impairment that could cause the symptoms alleged.  Id. at 594.  The ALJ must next

"expressly consider" whether a claimant has such an impairment." Id. at 596. If the claimant makes this showing, the ALJ must consider all evidence, including the claimant's statements about his symptoms, in determining whether the claimant is disabled. Craig, 76 F.3d at 595. While the ALJ must consider the claimant's statements, he need not credit them to the extent they are inconsistent with the objective medical evidence or to the extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged. Id.

Additionally, the regulations set forth certain factors for the adjudicator to consider to determine the extent to which the symptoms limit the claimant's capacity to work:

> 1) The individual's daily activities; 2) The location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) Factors that precipitate and aggravate the symptoms; 4) Type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) Any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and 7) Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. 404.1529(c) and 416.929(c) (2010).

Accompanying factors are provided in SSR 96-7p that the adjudicator must also consider in addition to the objective medical evidence when assessing the credibility of an individual's statements. These factors include medical signs and laboratory findings; diagnosis, prognosis, and other medical opinions provided by medical sources; and statements and reports about claimant's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the claimant's symptoms and how the symptoms

affect the individual's ability to work. SSR 96-7p.

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (7th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference." See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). "We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) (citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990)).

Claimant's argument regarding the ALJ's credibility determination is without merit. Claimant contends "[t]he decision is flawed in so considering [Claimant's] activities of daily living." See Pl.'s Mot., Pg. 5 (Dkt. 9). Contrary to Claimant's assertion, the ALJ's decision illustrates a proper credibility assessment. Under Craig v. Chater, 76 F.3d 585 (4th Cir. 1996), the ALJ must consider *all evidence* in determining whether Claimant is disabled. (emphasis added). The ALJ did precisely that. The ALJ explained her reasoning as to why she believed Claimant's allegations lacked veracity and the ALJ's consideration of Claimant's daily activities were but one factor considered. Specifically, the ALJ discusses Claimant's "apparent lack of willingness...to even apply for employment," the absence from Claimant's testimony of any "hospitalization for a prolonged period" or that Claimant "sought treatment at a pain clinic or surgery." (Tr. 16-17). Additionally, the ALJ also accentuated the inconsistencies in the evidence of record in relation to Claimant's actions and statements to medical providers. Lastly, the ALJ

considered the gaps in Claimant's medical treatment to reach a determination that Claimant's alleged symptoms were not "consistent with a condition which would render the [C]laimant unable to sustain consistent employment." (Tr. 17). The Court finds the ALJ considered more than just Claimant's daily activities and reasonably found Claimant's allegations of completely debilitating limitations not entirely credible. Therefore, this Court finds that the ALJ had more than a mere scintilla of evidence and appropriately discredited Claimant's subjective statements regarding his pain and symptoms.

Additionally, Claimant suggests the Court consider Carradine v. Barnhart, 360 F.3d 751 (7th Cir. 2004), for support that the ALJ erred. In that case, the claimant applied for social security disability benefits following a back injury from a slip and fall on ice. Id. at 754. The claimant was initially denied benefits by the ALJ and the district court. On appeal, the Court of Appeals for the Seventh Circuit granted that claimant benefits. Carradine is distinguishable from the current case on two grounds. First, the claimant sought "extensive and exhaustive treatment" to correct her condition. Id. at 755. Here, the ALJ notes numerous instances where Claimant either did not seek medical attention at all or when medical attention was sought, it was not related to Claimant's back problems. (Tr. 17). Second, the appellate court in Carradine found that substantial evidence existed establishing that claimant's inability to "maintain concentration and effort over the full course of the work week." Id. at 756. Here, the ALJ reasonably stated multiple explanations (*i.e.* objective medical evidence, Claimant's treatment history and the gaps therein, as well as, Claimant's daily activities) as to why the ALJ did not believe Claimant could not sustain consistent employment despite Claimant's impairments and limitations. The Court does not find Claimant has met his burden to show the ALJ's credibility determination was

"patently wrong."  Accordingly, the ALJ's determination will stand.

Claimant's argument regarding the ALJ's noncompliance with SSR 96-7p must also fail. Claimant contends the ALJ did not comply with SSR 96-7p because the ALJ used Claimant's unwillingness to undergo surgery against Claimant.  Contrary to Claimant's assertion, the record illustrates that the ALJ evaluated Claimant's symptoms in accordance with the two-part test in Craig and the SSR 96-7p factors.  Under Craig, the ALJ first found that "[C]laimant's medically determinable impairments could reasonably be expected to cause some of the symptoms alleged...." (Tr. 16).  Second, the ALJ expressly considered whether Claimant had such an impairment by devoting nearly three pages of analysis to explain her reasoning supporting her finding. (Tr. 16-18).  In accordance with the factors set forth in SSR 96-7p to evaluate Claimant's statements of his symptoms, the ALJ examined multiple sources of information in reaching her determination.  Specifically, the ALJ considered Claimant's objective medical evidence, his daily activities, Claimant's work history and Claimant's statements concerning the limiting effects of his symptoms. Id.  Claimant's general failure to seek treatment was only one factor considered by the ALJ.  By way of example, the ALJ notes that Claimant had not been hospitalized for any prolonged period, including hospitalization for Claimant's back problems, that Claimant did not seek treatment at a pain clinic nor did Claimant pursue physical therapy after the year 2000.  The Court finds the ALJ did not improperly discredit Claimant for failing to obtain treatment.  The ALJ supported her decision with substantial evidence based on Claimant's case record as a whole and not upon Claimant's failure to undergo surgery.  Accordingly, the Claimant's argument must fail.

**IV.  Recommendation**

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be **<u>DENIED</u>** because the ALJ properly evaluated the treating physician's reports, correctly assessed Claimant's credibility, and was in compliance with SSR 96-7p.

2.      Commissioner's Motion for Summary Judgment be **<u>GRANTED</u>** for the same reasons.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: <u>January 28, 2011</u>

<u>/s/</u> *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE